MOORE, Circuit Judge,
dissenting.
I join the majority opinion except for Part III-B because I disagree with the majority’s construction of “a patient.” I agree with the district court that “a patient” means “one or more patients” in accordance with the plain language of the asserted claims and with our precedent. I would affirm the district court’s summary judgment of infringement because undisputed evidence shows that at least one patient who was treated with the accused composition has not experienced “clinically significant electrolyte shifts” within the meaning of the claims. Therefore, I respectfully dissent.
Reexamined claim 15 of U.S. Patent No. 6,946,149 (149 patent), which is representative of the asserted claims, recites “[a] composition for inducing purgation of the colon of a patient, ... wherein the composition does not produce any clinically significant electrolyte shifts.... ” Everyone agrees that the preamble term “a patient” limits the scope of the claim. The disagreement centers on the meaning of “a patient.” The district court held that it meant one or more patients. The majority concludes that it means “a general class of persons,” or “a patient population.” Maj. Op. at 1357.
The plain and ordinary meaning of “a patient” is one or more patients. We have, on many occasions, construed the article “a.” Not surprisingly, this word appears in many patent claims. We have repeatedly held that “a,” when used in a “comprising” claim, means one or more. “As a general rule, the words ‘a’ or ‘an’ in a patent claim carry the meaning ‘one or more.’ The exceptions to this rule are extremely limited: a patentee must evince a clear intent to limit ‘a’ or ‘an’ to ‘one.’ ” 01 Communique Lab., Inc. v. LogMeIn, Inc., 687 F.3d 1292, 1297 (Fed.Cir.2012); see also SanDisk Corp. v. Kingston Tech. Co., Inc., 695 F.3d 1348, 1360-61 (Fed.Cir.2012) (concluding that “a” means “one or more”); Baldwin Graphic Sys., Inc. v. Siebert, Inc., 512 F.3d 1338, 1342 (Fed.Cir.2008) (“[T]his court has repeatedly emphasized that the indefinite article ‘a’ or ‘an’ in patent parlance carries the meaning of ‘one or more’ in open-ended claims containing the transitional phrase ‘comprising.’ ”). In the few instances where we have ever deviated from this general rule, we concluded that the intrinsic evidence made it clear that the patentee intended “a” to mean one and only one. See TiVo, Inc. v. EchoStar Commc’ns Corp., 516 F.3d 1290, 1303-04 (Fed.Cir.2008); Insituform Techs., Inc. v. Cat Contracting, Inc., 99 F.3d 1098, 1105-06 (Fed.Cir.1996).
Strangely, the majority does not conclude that “a patient” means “one or more,” consistent with our general rule, or that it means “only one,” consistent with the only exception that we have allowed. “A patient,” according to the majority, requires multiple patients, a patient population, or patient class. But there is no plain meaning of “a” that excludes the singular. We give claim terms their plain and ordinary meaning unless the patentee acted as its own lexicographer or there was a disavowal of claim scope. Thorner v. Sony Computer Entm’t Am. LLC, 669 F.3d 1362, 1365 (Fed.Cir.2012). Neither of these circumstances is present here. Although the majority is correct that the specification sometimes uses the plural “patients,” at other places it uses the singular “patient.” See '49 patent col. 2 11. 43-44, col. 2 1. 65, col. 3 1. 3, col. 5 1. 21. The patentee obviously knew how to refer to “patients” generally or as a class, but chose to draft the claims to recite only “a patient.” Nothing in the specification of *1366 the '149 patent or its prosecution history defines the singular “a patient” as a plural “patient population” contrary to the words of the claims. In fact, the patent lists only one object of the invention — and it is described in terms of impact on a single patient: “One purpose of the present research was to develop a safe, effective, and well tolerated small volume solution made up of a high concentration of poorly ab-sorbable salts that induce colon cleansing catharsis after oral ingestion without clinically significant alternation [sic] of sodium, chloride, bicarbonate, potassium, calcium, and phosphate level and balance or other untoward effects on the recipient.” Id. col. 3 11. 32-38.
I agree with the majority that the patent defines “clinically significant electrolyte shifts” as “alterations in blood chemistry that are outside the normal upper or lower limits of their normal range or other untoward effects.” Id. col. 2 ll. 47-51. According to the patent, clinical significance is measured in an individual patient. Namely, are the electrolyte shifts in an individual patient clinically significant, i.e., are they outside the normal range? “Clinical significance” can sometimes refer to a measure of statistical significance and other times to a measure of deviation from normal in an individual patient. This patent, as discussed above, expressly defines it as a measure in an individual patient. See also id. col. 2 ll. 43-44 (the invention avoids electrolyte shifts that are “clinically significant to the patient”); id. col. 3 ll. 66-67 (“clinically significant electrolyte shifts on bodily chemistry ”); id. col. 3 ll. 35-38 (“clinically significant alternation [sic] ... or other untoward effects on the recipient ”). Extrinsic evidence of record likewise demonstrates that clinical significance is a measure applied to a single patient. For example, the record includes a laboratory report on an individual patient that directs the analyst to indicate whether the test results were “Clinically Significant” or “Not Clinically Significant” for that patient, J.A. 6756, and expert reports confirm this single-patient meaning of the term, see J.A. 5059; J.A. 5153-54. Indeed, the use of the term “clinical significance” to refer to individual patients is well-established in the medical arts. See, e.g., Alan E. Kazdin, The Meanings and Measurement of Clinical Significance, 67 J. Consulting & Clinical Psychol. 332, 332-33 (1999) (asking whether “the criterion of clinical significance may not be met” when “the client improves, but at the end of treatment the client’s behavior has not changed enough for it to fall within the normative range”). I see no basis in the specification or the prosecution history to rewrite the patent claims.
This claim covers “[a] composition for inducing purgation of the colon of a patient ... wherein the composition does not produce any clinically significant electrolyte shifts.... ” To infringe, the composition must induce purgation in the colon of a patient without producing clinically significant electrolyte shifts (ie., shifts outside the normal range) in that patient. Infringement is proven if the composition causes these reactions in a single patient. The majority believes this to be an “absurd result” because it would allow “a composition to meet the claims even if 99 patients out of 100 experienced clinically significant electrolyte shifts, as long as one patient did not.”[1] Maj. Op. 1357. I understand the majority’s concern. But this is a question of damages, not infringement.
Infringement, whether on a large or small scale, is still infringement.[2] See, e.g., Lucent Techs., Inc. v. Gateway, Inc., 580 *1367 F.3d 1301, 1318 (Fed.Cir.2009). Lucent makes clear that there is no “rare infringement” exception to liability, and that even one instance of infringement is adequate to support a judgment of infringement. Id. (affirming a finding of direct infringement where a jury “could have reasonably concluded that ... more likely than not one person somewhere in the United States had performed the claimed method”); see also Broadcom Corp. v. Emulex Corp., 732 F.3d 1325, 1333 (Fed.Cir.2013) (“It is well settled that an accused device that sometimes, but not always, embodies a claim nonetheless infringes.”). The law responds to rare infringement not by eliminating liability, but by providing for a correspondingly low award of damages. See Lucent, 580 F.3d at 1334 (“The damages award ought to be correlated, in some respect, to the extent the infringing method is used by consumers.”). Likewise, the decision whether to award injunctive relief in a patent infringement suit, which is at the discretion of the district court, includes consideration of the extent of infringement or harm to the patentee. See Robert Bosch LLC v. Pylon Mfg. Corp., 659 F.3d 1142, 1148-50 (Fed.Cir.2011).
And here lies the heart of the majority’s problem. This is an ANDA case. In ANDA cases in which the accused product has not yet been marketed, a damages remedy is of course not available. Instead, the district court “shall order the effective date of any approval of the drug ... involved in the infringement to be a date which is not earlier than the date of the expiration of the patent which has been infringed,” and the court “may” grant “injunctive relief.” 35 U.S.C. § 271(e)(4)(A), (B). Thus, while the injunction remedy rests within the discretion of the district court, the order to delay the approval of the ANDA until patent expiration is not discretionary. Id. I don’t like this result either, but this is exactly what the statutory language commands. The statute requires the court to delay approval until expiration of the patent, even if there is only a single infringement. And since the generic can’t launch without FDA approval, the statute creates a de facto injunction.
In an effort to avoid this outcome, the majority rewrites the claim language to allow infringement only if the drug works in a patient population rather than a patient.[3] But this we cannot do. Chef Am., Inc. v. Lamb Western, Inc., 358 F.3d 1371, 1374 (Fed.Cir.2004) (“[W]e construe the claim as written.... ”); Process Control Corp. v. HydReclaim Corp., 190 F.3d 1350, 1357 (Fed.Cir.1999) (“[A] nonsensical result does not require the court to redraft the claims.... ”). If the result commanded by the statute is unsatisfactory, the proper response is for Congress to amend the statute, making the delayed approval discretionary rather than mandatory, not for us to redraft the patent to avoid such a result. For these reasons, I respectfully dissent. I would affirm the district court’s summary judgment of infringement.

. To be sure, there is evidence in the record in this case that the claimed composition infringes in numerous instances, not just one. See Maj. Op. at 1357.

. It may be that the FDA would not approve a drug that has efficacy in a small percentage of *1367 the patients who take it, but that is not the standard we use in assessing infringement of patent claims.

. Changing "a patient” to "a patient population" is pernicious for practical reasons as well. Infringement will now be measured by whether a patient population experiences pur-gation without abnormal shifts in electrolytes. What percentage of people constitutes a patient population? Is the patient population everyone who takes the drug? A statistically significant number of people who take the drug — which would be 99.5%? A majority? And have we now written an indefinite or unsupported claim for the patentee?